FILED
NOV 10 2016
UNITED STATES DISTRICT COURT
MARY C. LOEWENGUTH, CLERK
WESTERN DISTRICT OF NY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

KENNETH O. HALL,

               Plaintiff,

      v.

LSREF4 LIGHTHOUSE CORPORATE
ACQUISITIONS, LLC, LIGHTHOUSE
MANAGEMENT SERVICES, LLC,
HOME PROPERTIES, L.P., and HOME
PROPERTIES, INC.,

               Defendants.

**DECISION AND ORDER**

6:16-CV-06461 EAW

---

## INTRODUCTION

Plaintiff Kenneth O. Hall ("Plaintiff") brings this action for damages relating to an alleged breach of the Amended and Restated Executive Retention Plan (the "Plan") by Defendants LSREF4 Lighthouse Corporate Acquisitions, LLC, Lighthouse Management Services, LLC, Home Properties, L.P., and Home Properties, Inc. (collectively "Defendants"). (Dkt. 1-2 at 10). Plaintiff commenced this litigation in state court, and Defendants removed the action to this Court on the basis that the Plan is covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq*. (Dkt. 1-1). Plaintiff has filed a motion seeking remand, contending that the Court lacks subject matter jurisdiction because the Plan is not an ERISA plan. (Dkt. 4; Dkt. 9). Defendants oppose the motion to remand. (Dkt. 8).

As discussed below, Defendants have failed to sustain their burden of establishing that the Plan is governed by ERISA, and as a result, this Court lacks subject matter

jurisdiction. Therefore, Plaintiff's motion to remand (Dkt. 4) is granted and the case is remanded to state court.

## FACTUAL BACKGROUND

The following facts are drawn from Plaintiff's Complaint and papers attached thereto and assumed to be true for the purposes of determining the motion to remand.

Home Properties, Inc., a real estate investment trust or REIT, was founded in Rochester, New York, and was later publically traded on the New York Stock Exchange ("NYSE"). (Dkt. 1-2 at ¶¶ 5, 6). In 2015, the private equity firm Lone Star Funds acquired Home Properties, Inc., taking it private and delisting the company from the NYSE. (*Id.* at ¶ 6). Home Properties, L.P. is the "operating partnership" of Home Properties, Inc., and now operates under the control of Lone Star Funds and Defendants LSREF4 Lighthouse Corporate Acquisitions, LLC, and Lighthouse Management Services, LLC. (*Id.* at ¶ 7).

Plaintiff was employed by Home Properties, L.P. from June 27, 2005, through October 7, 2015, serving as Vice President and Controller. (*Id.* at ¶¶ 8, 26). After Lone Star Funds' acquisition, he became employed by Lighthouse Management Services, LLC, until January 8, 2016. (*Id.* at ¶ 8).

Home Properties, Inc. and Home Properties, L.P. adopted the Plan as of February 12, 2011, which superseded the Executive Retention Plan of February 2, 1999. (*Id.* at ¶ 9; *Id.* at 13). The Plan states that it is governed by Maryland law. (*Id.* at 19 (§ 9)).

The purpose of the Plan is to:

> assure that certain of the Company's officers and employees . . . will be able to carry out their functions in the best interests of the shareholders of the Company and the partners of the Operating Partnership not distracted by the ongoing consolidation in the REIT industry and notwithstanding the possibility, threat or occurrence of a Change of Control . . . of the Company

and to:

> diminish the inevitable distractions of the Participants[1] because of the personal uncertainties and risks created by a pending or threatened Change of Control and to encourage the Participant's full attention and dedication to Home Properties, Inc. currently and in the event of any threatened or pending Change of Control, and to provide the Participants with compensation and benefits arrangements upon a Change of Control which ensure that (a) such attention and dedication are likely through protecting the compensation and benefits expectations of the Participants, and (b) such arrangements are competitive with those of other entities in the REIT industry.

(*Id.* at 13). The Plan defines "Change of Control" to include the acquisition of 25% or more of Home Properties, Inc.'s shares of common stock outstanding at the time of the acquisition. (*Id.* at ¶ 12; *Id.* at 14). Lone Star Funds' acquisition involved LSREF4 Lighthouse Corporation Acquisitions, LLC acquiring all of Home Properties, Inc.'s outstanding shares of stock, thereby qualifying as a "Change of Control." (*Id.* at ¶ 28).

In return for attention and dedication, the Plan promised "Corporate Staff" certain compensation in the event of termination under certain circumstances following a "Change of Control." (*Id.* at ¶¶ 13-14). For instance, as relevant here, a "Corporate Staff" member could terminate his employment at any time within two years of the "Change of Control" with "Good Reason," as defined in the Plan. (*Id.* at ¶ 14; *Id.* at 17). The Plan provided:

---

[1]  "Participants" are defined in the Plan as "Corporate Staff" or "Other Senior Staff." (Dkt. 1-2 at 16). "Corporate Staff" includes the officers of the Company. (*Id.* at 15-16).

In the event the employment of a member of Corporate Staff is terminated on or after the Effective Date [of a Change of Control] and during the two-year period following such Effective Date *by the Company without Cause* or *by the Corporate Staff member for Good Reason*, the Company shall pay to the Corporate Staff member in *a lump sum in cash within 30 days after the Termination Date* the aggregate of the following amounts: (i) the Corporate Staff member's Base Salary through the Termination Date to the extent not theretofore paid, (ii) all other amounts earned, accrued or deferred under the Bonus Plan, (iii) two times the Corporate Staff member's Base Salary; and (iv) an amount equal to two times the greater of (y) the Corporate Staff member's target Bonus for services rendered in the year in which the Termination Date occurs; or (z) the average Bonus paid to the Corporate Staff member for services rendered in each of the three years prior to the year in which the Termination Date occurs. In the event that the vesting of equity-based awards as described in Section 4 below, together with all other payments and the value of any benefit received or to be received by the Corporate Staff member would result in all or a portion of such payment being subject to Excise Tax, then the Corporate Staff member's payment shall be either: (a) the full payment; or (b) such lesser amount that would result in no portion of the payment being subject to the Excise Tax, whichever of the foregoing amounts, taking into account the applicable federal, state, and local employment taxes, incomes taxes, and the Excise Tax, results in the receipt by the Corporate Staff member, on an after-tax basis, of the greatest amount of the payment notwithstanding that all or some portion of the payment may be taxable under Section 4999 of the Code. All determinations required to be made under this Section shall be made by a nationally recognized accounting firm or such other consultant expert in such calculations as the Company may select immediately prior to the event triggering the payments that are subject to the Excise Tax (the "Accounting Firm").

(*Id.* at 17 (emphasis added)).

"Cause" is defined under the Plan to include "the willful and continued failure of a Participant to perform substantially the Participant's duties with the Company . . . after a written demand for substantial performance is delivered to a Participant . . ." or "the willful engaging by the Participant in illegal conduct or gross misconduct which is materially and demonstrably injurious to the Company. . . ." (*Id.* at 14).

"Good Reason" is defined under the Plan to include the following:

(1)     "a material reduction, without the Participant's written consent, of the Participant's duties, responsibilities, and authority from the Participant's duties, responsibilities, and authority as in effect immediately prior to the Change in Control;"

(2)     "the Company's requiring Participant to be based at any office or location more than 30 miles from the location at which the Participant was principally employed prior to the Change in Control;"

(3)     "a material reduction by the Company of the Participant's base compensation or incentive compensation opportunity;" or

(4)     the failure of the Company to require any successor to assume and agree to perform under the terms of the Plan.

(*Id.* at 16).

Plaintiff alleges that, as Vice President and Controller, he was covered by the Plan (*id.* at ¶ 27), and he suffered a material reduction of his duties, responsibilities, and authority, without his written consent, as compared to his duties, responsibilities, and authority immediately prior to the "Change of Control" (*id.* at ¶ 29). Plaintiff alleges that, as Controller, he was one of Home Properties, Inc.'s four senior financial officers, but that after the acquisition, he had no senior financial duties, was stripped of his Vice President title, and was no longer in an officer position. (*Id.* at ¶ 30). Plaintiff alleges various other purportedly significant alterations to his job responsibilities, which he contends constitute "Good Reason" justifying his decision to terminate his employment

under the terms of the Plan. (*Id.* at ¶¶ 30-35, 38). Similarly, Plaintiff alleges that after the "Change of Control," he suffered a material reduction in his opportunity for incentive compensation, thus serving as further grounds for "Good Reason" to terminate his employment. (*Id.* at ¶¶ 36-38).

Plaintiff contends that he terminated his employment for "Good Reason" as defined under the Plan by letter dated December 9, 2015, effective January 8, 2016. (*Id.* at ¶¶ 38-39). The CEO of Lighthouse Management Services, LLC, Daniel E. Earle, informed Plaintiff by letter dated December 15, 2015, that the company did not agree with Plaintiff's characterization of "Good Reason" and informed Plaintiff that Defendants would not pay the termination payment contemplated by the Plan. (*Id.* at ¶ 40). Plaintiff terminated his employment on January 8, 2016, and Defendants have repeatedly declined to pay Plaintiff the termination payment. (*Id.* at ¶¶ 41-42).

## PROCEDURAL BACKGROUND

On or about June 17, 2016, Plaintiff commenced this litigation New York State Supreme Court, Monroe County. (Dkt. 1-2 at 2). Defendants removed the action to this Court on July 5, 2016, citing original federal jurisdiction under ERISA. (Dkt. 1-1). On August 2, 2016, Plaintiff made the instant motion to remand to state court. (Dkt. 4). Shortly thereafter, on August 12, 2016, Defendants filed a motion to dismiss. (Dkt. 6). The Court deferred briefing on the motion to dismiss in view of the pending motion to remand. (Dkt. 7). In accordance with the schedule set by the Court, Defendants' response in opposition to the motion to remand was filed on August 23, 2016, and

Plaintiff's reply was filed on September 6, 2016. (Dkt 8; Dkt. 9). Oral argument before the undersigned was held on October 17, 2016. (Dkt. 11).

## DISCUSSION

### I.   Standard of Review

Under 28 U.S.C. § 1441(a), "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to [a] district court of the United States"; however, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). "A party seeking removal bears the burden of showing that federal jurisdiction is proper." *Montefiore Med. Ctr. v. Teamsters Local 272*, 642 F.3d 321, 327 (2d Cir. 2011). Additionally, "[w]hen considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff." *Fed. Ins. v. Tyco Int'l Ltd.*, 422 F. Supp. 2d 357, 391 (S.D.N.Y. 2006) (citation omitted).

"One category of cases over which the district courts have original jurisdiction are 'federal question' cases; that is, those cases 'arising under the Constitution, laws, or treaties of the United States.'" *Metro. Life Ins. v. Taylor*, 481 U.S. 58, 63 (1987) (citing 28 U.S.C. § 1331). In determining whether the Court has removal jurisdiction in the federal-question context, the "well-pleaded complaint rule" typically governs, which requires a court to consider only allegations in the complaint and not matters raised by the defendant in defense. *See Franchise Tax Bd. of the State of Cal. v. Constr. Laborers*

*Vacation Tr.*, 463 U.S. 1, 9-10 (1983); *Metro. Life*, 481 U.S. at 63 ("The 'well-pleaded complaint rule' is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts."). "The well-pleaded-complaint rule confines the search for a basis of federal question jurisdiction to 'what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration, unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may impose.'" *Lupo v. Human Affairs Int'l Inc.*, 28 F.3d 269, 272 (2d Cir. 1994) (quoting *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914)).

## II.   ERISA Removal

ERISA was enacted because "Congress found it desirable that 'disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of [employee benefit] plans,'" *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 15 (1987) (quoting 29 U.S.C. § 1001(a)), and to ensure "uniformity of regulation with respect to [these plans'] activities." *Id.* (quoting H.R. Rep. No. 94-1785, p. 46 (1977)).   ERISA supersedes any state laws that relate to employee benefit plans established or maintained by any employer engaged in commerce or in any industry or activity effecting commerce. *See* 29 U.S.C. § 1144(a); 29 U.S.C. § 1003.

Despite the aforementioned constraints of the well-pleaded complaint on removal, the Supreme Court has held that "Congress may so completely preempt a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life*, 481 U.S. at 63-64; *see, e.g., Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557 (1968) (finding complete

preemption and original federal jurisdiction under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185).   Section 502(a)(1)(B) of ERISA's civil enforcement provisions, 29 U.S.C. § 1132(a)(1)(B),[2] is one such area.  The *Metro. Life* Court held that "Congress has clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of § 502(a) removable to federal court."[3]  *Metro. Life,* 481 U.S. at 65-66.  "In other words, 'if [a plaintiff's] state law claim is within the scope of § 502(a) it is completely preempted regardless of how he has characterized it.'" *Moscovitch v. Danbury Hosp.*, 25 F. Supp. 2d 74, 79 (D. Conn. 1998) (quoting *Jass v. Prudential Health Care Plan, Inc.*, 88 F.3d 1482, 1488 (7th Cir. 1996)); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with clear congressional intent to make the ERISA remedy exclusive, and is therefore pre-empted.").

---

[2]     Section 502(a)(1)(B) provides:

A civil action may be brought—
(1) by a participant or beneficiary—

. . .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

[3]     Indeed, the plain language of the statute points to such a result.  *See* 29 U.S.C. § 1132(e) ("State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction of actions under paragraphs (1)(B) . . . of subsection (a) of this section."); *id.* § 1132(f) ("The district courts of the United States shall have jurisdiction, without respect to the amount in controversy or the citizenship of the parties, to grant the relief provided for in subsection (a) of this section in any action.").

Therefore, this Court must determine whether "[P]laintiff's claims fall within the complete preemption ambit of ERISA § 502(a)." *Moscovitch,* 25 F. Supp. 2d at 79.

## III.   ERISA Governance of the Plan

A cause of action is completely preempted by ERISA "if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions." *Aetna Health,* 542 U.S. at 210.   However, "Congress [only] pre-empted state laws relating to *plans,* rather than simply to *benefits*" because the concern of providing "a uniform set of administrative procedures governed by a single set of regulations" only arises "with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Fort Halifax,* 482 U.S. at 11 (emphasis in original). "Only a plan embodies a set of administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation." *Id.* at 11-12.   ERISA regulates both employee welfare benefit plans and pension benefit plans. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins.,* 514 U.S. 645, 650 (1995); *see also* 29 U.S.C. § 1002(1)-(3).

The ERISA statute defines "employee welfare benefit plan" as:

[A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section

186(c) of this title (other than pensions on retirement or death, and
insurance to provide such pensions).

29 U.S.C. § 1002(1).  The Second Circuit has stated that the use of the word "any" in

conjunction with the three words "plan, fund, or program" suggests that "Congress

intended the definition of 'employee welfare benefit plan' to be broad and independent of

the specific form of the plan." *Okun v. Montefiore Med. Ctr.*, 793 F.3d 277, 279 (2d Cir.

2015).  Thus, "[t]he term 'employee welfare benefit plan' has been held to apply to most,

but not all, employer undertakings or obligations to pay severance benefits." *Schonholz*

*v. Long Island Jewish Med. Ctr.*, 87 F.3d 72, 75 (2d Cir. 1996)).  The Supreme Court and

the Second Circuit have emphasized, however, that "ERISA applies only where such an

undertaking or obligation requires the creation on an ongoing administrative program."

*Id.*  The parties' main dispute here is whether the Plan at issue qualifies as an employee

welfare benefit plan under the above contours.

A.   <u>**Determining if the Plan requires an "Ongoing Administration"**</u>

The Second Circuit has "identified three non-exclusive factors to help determine

whether an employer's particular undertaking involves the kind of ongoing administrative

scheme inherent in a 'plan, fund, or program'":

> (1) whether the employer's undertaking or obligation requires managerial
> discretion in its administration; (2) whether a reasonable employee would
> perceive an ongoing commitment by the employer to provide employee
> benefits; and (3) whether the employer was required to analyze the
> circumstances of each employee's termination separately in light of certain
> criteria.

*Okun*, 793 F.3d at 279 (quoting *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 566 (2d

Cir. 1998) (quoting *Schonholz*, 87 F.3d at 76)).  "The [Second Circuit] has not decided

'which one or more of these factors will be determinative in every case,' nor did it 'preclude the possibility that other factors might be relevant in different factual settings.'" *Sheer v. Isr. Disc. Bank of N.Y.*, No. 06 Civ. 4995 (PAC), 2007 U.S. Dist. LEXIS 16488, at *5 (S.D.N.Y. Mar. 7, 2007) (quoting *Tischmann*, 145 F.3d at 566). While there is no statutory requirement in 29 U.S.C. § 1002(1) that plans involve long-term commitments or discretionary determinations to fall under ERISA, "these factors are useful analytic tools to the extent they help [a court] decide . . . whether a particular undertaking or obligation is a 'plan, fund, or program.'" *Okun*, 793 F.3d at 279. Likewise, the "usual earmarks" of an ERISA plan may include plan documents, a plan administrator, fiduciaries, a mechanism for administrative review, employee contributions, procedures to submit claims, monies set aside or held in trust, reference to ERISA, reference to a regulatory scheme or plan, and a defined group of participants. *See Sheer*, 2007 U.S. Dist. LEXIS 16488, at *10-11; *Taverna v. Credit Suisse First Boston (USA), Inc.*, No. 02 Civ. 5240 (DC), 2003 U.S. Dist. LEXIS 1607, at *10 (S.D.N.Y. Feb. 4, 2003). However, "[t]here is no authoritative checklist that can be consulted to determine conclusively if an employer's obligations rise to the level of an ERISA plan." *Schonholz*, 87 F.3d at 76 (quoting *Belanger v. Wyman-Gordon Co.*, 71 F.3d 451, 455 (1st Cir. 1995)). Indeed, "line drawing . . . is necessary and close cases will approach the line from both sides." *Tischmann*, 145 F.3d at 566 (alteration in original) (quoting *Simas v. Quaker Fabric Corp.*, 6 F.3d 849, 854 (1st Cir. 1993)).

B.    **Relevant Cases Analyzing the Three Factors**

The application of the factors described above is largely fact-dependent.  Because of this, the Court looks to several cases by way of comparison.

The Supreme Court dealt with the issue of determining whether a state severance statute constituted an employee welfare benefit plan for purposes of ERISA in the cornerstone case *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987).  The employer attempted to evade its obligations under the statute on the ground that the statute was preempted by ERISA.  The Court rejected this argument, holding that a Maine statute "requiring employers to provide a one-time severance payment to employees in the event of a plant closing,"[4] *id.* at 3, "neither establishe[d], nor require[d] an employer to maintain, an employee welfare benefit 'plan.'" *Id.* at 6.  In so holding, the Court stated:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation.  The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control.   Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize.  The employer may well *never* have to pay the severance benefits.  To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes.   To do little more than write a check hardly constitutes the operation of a benefit plan.  Once this single event is over, the employer has no further responsibility.  The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

*Id.* at 12 (emphasis in original).

---

[4]    Employees who had worked in the plant three or more years were to receive a severance payment of one week's pay for each year of employment.  *Fort Halifax Packing Co.*, 482 U.S. at 5.

The Second Circuit applied the same "equally applicable" reasoning from *Fort Halifax* to a plan in its decision in *James v. Fleet/Norstar Fin. Grp., Inc.*, 992 F.2d 463 (2d Cir. 1993) in finding no ERISA coverage. In *James*, the court reversed the district court's grant of summary judgment in favor of the employer on the employee's state law claims, which had been based on its finding that the state law claims were preempted by ERISA. *Id.* at 464. The Second Circuit held that "an employer's undertaking to give employees sixty days of pay following their last day of work if the employees would remain on the job until an internal consolidation was completed" did not qualify as an employee welfare benefit plan under ERISA. *Id.* at 464, 466. There, the severance pay would "occur over a short time and did not 'require[] an ongoing administrative program to meet the employer's obligation.'" *Id.* (alteration in original) (quoting *Fort Halifax*, 482 U.S. at 11). The need to make simple arithmetical calculations, such as each employee's amount of severance and appropriate deductions for social security taxes, health/medical benefits, and 401k plans, did not necessitate a uniform administrative scheme. *Id.* at 467. Additionally, that the employees had an option to receive the payment in biweekly installments rather than a lump sum "did not change the basic situation." *Id.* at 466.

The Second Circuit reached a different conclusion in *Schonholz v. Long Island Jewish Med. Ctr.*, 87 F.3d 72 (2d Cir. 1996), finding ERISA covered a severance pay program circulated by the defendant's president that provided for payments to senior-level employees upon involuntary discharge. *See id.* at 74. Payments were based on the length of time the employee held his position and would be made "only if the employee

displayed a reasonable and good faith effort to obtain a position commensurate with his former level of responsibility." *Id.* Additionally, if the employee was terminated for illegal conduct or for "substantially deficient performance," he would not be eligible for the payments. *Id.* There was no provision for the plan's termination or amendment. *Id.* The Board of Trustees later became aware of the plan and revoked it as having never been approved or adopted, leading to litigation. *Id.* A former employee brought suit, and the district court granted summary judgment in favor of the employer. *Id.* at 75. The Second Circuit affirmed the district court's finding of jurisdiction based upon its determination that the plan was covered by ERISA, but it reversed the grant of summary judgment on other grounds. *Id.* at 80.

*Schonholz* is the first Second Circuit case that pulls together the three factors, enumerated in the previous section, from *Bogue v. Ampex Corp.*, 976 F.2d 1319 (9th Cir. 1992), *Belanger v. Wyman-Gordon Co.*, 71 F.3d 451 (1st Cir. 1995), and *Fontenot v. NL Indus., Inc.*, 953 F.2d 960 (5th Cir. 1992). Using these factors, the Second Circuit found that the plan was covered by ERISA because the plan "necessitated both managerial discretion and a separate analysis of each employee in light of certain criteria," namely, whether the termination was involuntary, for illegal conduct, or because of substantially deficient performance. *Schonholz*, 87 F.3d at 76. Additionally, the analysis required a determination of whether the employee was making a reasonable and good faith effort to obtain suitable employment that was commensurate with the employee's former organization level and scope of responsibility. *Id.* The Plan also was "not limited either to a single payment or to a short span of time upon a plant or office closing. The . . .

effective period was unlimited and would have reasonably been perceived by an employee as an ongoing commitment," unlike the plans at issue in *Fort Halifax* or *James*. *Id.* at 76-77.

In *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561 (2d Cir. 1998), the defendant created plans to provide severance benefits for approximately 20 senior executives, including the plaintiff. *Id.* at 562. Under the plan, "a covered executive would receive severance payments in an amount based on his previous salary if his employment was terminated involuntarily, unless the termination was 'for cause.'" *Id.* The payments could be made periodically or in a lump sum; however, employees receiving the payments would be subject to certain continuing obligations including being available to provide "reasonable assistance, consistent with the level of the Executive's prior position. . . ." *Id.* at 562, 566-67.

The Second Circuit found ERISA coverage because there was discretion and the need for a case-by-case review: the determination of "for cause" was necessary and, under the Plan, the defendant was not obliged to continue severance payments if the employee, *inter alia*, engaged in activity inimical to the best interests of the company, disparaged the company, or failed to comply with the company's code of conduct. *Id.* at 567. Similarly, the requirement to be available to provide "reasonable assistance consistent with the level of the Executive's prior position" required taking into account "other commitments which the Executive may have." *Id.* Thus, a number of "context-sensitive judgments, requiring managerial discretion on a continuing, individualized basis" were present. *Id.* The commitment was also "ongoing" because, despite a

- 16 -

termination/amendment clause, which cut against a reasonable employee perceiving an ongoing commitment, the termination right was not absolute in that such an action could not adversely impact an employee whose employment was terminated within two years of such action. *Id.* at 566. Additionally, unlike in *Fort Halifax* and *James*, the plan was "not limited either to a single payment or to a short span of time upon a plant or office closing. . . . Rather, [it was] designed to pay benefits when each covered executive [left] . . . which might well be expected to occur over a protracted period of time." *Id.*

Similarly, employees receiving the benefits were required to "continue to be available to render the company reasonable assistance, consistent with the level of the Executive's prior position with the Company, at times and locations that [were] mutually acceptable." *Id.* at 566-67. Employees could lose severance benefits if they failed to comply with specified standards of conduct during the period of receipt of benefits. *Id.* at 567. This was representative of the ongoing nature of the commitment.

Conversely, then-District Judge Chin found no ERISA coverage in *Taverna v. Credit Suisse First Boston (USA), Inc.*, No. 02 Civ. 5240 (DC), 2003 U.S. Dist. LEXIS 1607 (S.D.N.Y. Feb. 4, 2003). There, the defendant distributed a letter separation agreement to designated employees naming a termination date for the employees. *Id.* at *3. Employees would receive a lump sum severance calculated at "one month of salary for each year of service with a minimum of one month and a maximum of twelve months," outplacement services, and medical coverage for three or six months depending on the length of service. *Id.* Some employees needed to remain transitionally past the termination date. *Id.* These employees were covered by a transition agreement which

offered normal salary for the extra time plus one month's salary for each full additional month worked and an additional discretionary bonus to be paid within 30 days of final termination. *Id.* at *4. Both agreements required employees to continue performing in a "satisfactory manner." *Id.*

As to the separation agreement, the court found that no discretion was necessary in the simple arithmetical calculations required to determine the severance amount. *Id.* at *8. Likewise, the determination of whether employees continued performing in a "satisfactory manner" required only a "minimal quantum of discretion"—"not the type of discretion regulated by ERISA." *Id.* at *8-9. It also found that no reasonable employee would view the severance, outplacement, and limited continued medical coverage as a commitment to provide ongoing benefits. *Id.* at *9. Additionally, no separate review of each employee's termination was needed. *Id.* There were no contingencies of the type that existed in *Schonholz*, which included the employee's prospects for reemployment and his efforts to obtain commensurate employment, and, unlike in *Schonholz*, there was a termination date for the commitment. *Id.* at *9-10. Finally, none of the "usual earmarks" of an ERISA plan were present. There were no plan documents other than the separation agreement, and there was no indication of a plan administrator, plan fiduciaries, provisions for seeking administrative review, employee contributions, procedures for submitting claims, or monies set aside or held in trust. *Id.* at *10.

As to the transition agreement, the discretionary bonus made the first factor, discretion, a closer call; however, this determination was not to be made under a set of criteria, but rather under the defendant's sole discretion, thus no ongoing administrative

program was required—it was still just a one-time promise to make a lump sum payment. *Id.* at *11-13. As above, the transition agreement could not be viewed as an ongoing commitment as it had a specified term and there were no individual determinations required with respect to the discharge of each employee. *Id.* at *12. In relation to the "usual earmarks," there were no plan documents other than the letter, and no plan administrator, fiduciaries, provisions for seeking administrative review, employee contributions, procedures for submitting claims, or monies set aside or held in trust. *Id.*

Likewise, the Southern District of New York also found no ERISA coverage in *Sheer v. Israel Disc. Bank of N.Y.*, No. 06 Civ. 4995(PAC), 2007 U.S. Dist. LEXIS 16488 (S.D.N.Y. Mar. 7, 2007), and granted the plaintiff's motion to remand. There, the severance package included one year's base salary payable in a lump sum, unless the employee was fired "for cause." *Id.* at *2. Additionally, a "Supplemental Executive Retirement Plan" ("SERP") was put in place in case of a change of control, providing for a lump sum payment. *Id.*

The court found that no discretion was required because there was no discretion as to the amount of the severance benefit. *Id.* at *7. Just because the amount might be different for all three beneficiaries, no more than simple arithmetic calculations were required. *Id.* There was also nothing discretionary "about the timing, form, or amount of payments." *Id.* The court further found that "there [were] no ongoing responsibilities on the part of the Bank or the employees pursuant to either agreement once the employee receive[d] her severance payment and [left] the company." *Id.* This was unlike *Tischmann* where, despite a similar lump sum payment and "for cause" determination,

the employee also had to continue to be available to render services to the company under reasonable circumstances and the benefits could be terminated if the employee violated enumerated provisions of the agreement. *Id.* at *7-8. It was also unlike *Schonholz*, where the employee had to make reasonable attempts to find commensurate employment, otherwise the payments would cease. *Id.* at *8. Finally, in *Sheer*, there was a provision enabling the bank to amend or terminate at its discretion without advance notice. *Id.*

The court also found no individualized review was necessary under the *Sheer* plan. Despite some managerial discretion required in the "for cause" determination, that was not the type of discretion covered by ERISA. *Id.* The facts in *Sheer*, the court said, were less like those in *Tischmann* and *Schonholz* and more like those in *Taverna*, in which a "satisfactory manner" determination only entailed a "minimal quantum of discretion," unlike the discretion contemplated by ERISA. *Id.* at *9. In *Sheer*, "for cause" was defined as six triggering events in the employment contract and three in the SERP. *Id.* at *9-10. "This type of discretion is not open-ended, but rather requires the employer to analyze only a fixed set of criteria." *Id.* at *10; *cf. Taverna*, 2003 U.S. Dist. LEXIS 1607 at *11-13 (finding that a lack of criteria as to determining a discretionary bonus cut against a finding of an ongoing administration).

Finally, as in *Taverna*, none of the "usual earmarks" of an ERISA plan were present. *Id.* at *10-11. Additionally, the employment contract made no mention of ERISA, nor to a plan or regulatory scheme, nor a defined group of plan participants. *Id.* at *11. "The choice of law provision strictly call[ed] for the application of New York law, without reference to ERISA or any federal law." *Id.* While the SERP had an

administrator and a claims process, no other facts pointed to it being an ERISA plan, despite language evincing an intent to qualify under ERISA (since such language cannot transform an employment benefit plan into an ERISA plan). *Id.* at *11-12.

Once again, in *Nowak v. International Fund Services. (N.A.), L.L.C.*, No. 09 Civ. 5103 (WHP), 2009 U.S. Dist. LEXIS 69097 (S.D.N.Y. Aug. 7, 2009), the Southern District found no ERISA coverage where two former officers of the defendant received a severance memo, providing that, "should [the plaintiffs] be terminated for any reason other than cause, [the plaintiffs] would be entitled to four (4) weeks salary for each year of completed service" and that "[t]he firm [would] pay for [the plaintiffs'] medical and dental COBRA for the duration of [their] severance period." *Id.* at *1-2. The severance memo attached the separation of employment policy which provided that, in cases of involuntary termination, employees would be eligible for severance pay: officers were eligible for four weeks of pay for every year of service and might be eligible to receive continuation of medical and dental benefits at the discretion of management. *Id.* at *2. The policy stated the contours for eligibility as: termination due to a reduction in staff or layoff; a regular replacement being hired and the original or a comparable position no longer being available; or an HR determination that an employee's work performance was the result of factors that may be beyond his or her control. *Id.* at *2-3. The first scenario applied to the plaintiffs. *Id.* at *1.

The *Nowak* Court found that the defendant had no discretion as to the amount of benefits—though they might differ from person to person, the calculation only required simple arithmetic. *Id.* at *5. Though payments could continue for almost two years,

there was nothing discretionary about the "timing, form, or amount of payments." *Id.* Similarly, the company had no ongoing responsibilities other than sending checks and Plaintiffs had no ongoing obligations to the company. *Id.* at *6. Also, though the policy limited severance to a few narrow circumstances and made continued health benefits discretionary, the severance memo guaranteed severance and health benefits in any circumstance other than termination for cause. *Id.* at *6-7. "[N]o reasonable employee could conclude that the severance memo was anything other than a specific and defined commitment between the company and two key officers." *Id.* at *7 (citing *Taverna*, 2003 U.S. Dist. LEXIS 1607, at *3). Finally, as to individualized review, the only managerial discretion contemplated was whether the plaintiffs were terminated "for cause." *Id.* "That 'minimum quantum of discretion' to determine whether dismissal was 'for cause' [was] insufficient to catapult a severance agreement into an ERISA plan." *Id.* (citing *Taverna*, 2003 U.S. Dist. LEXIS 1607, at *3).[5]

Most recently, the Second Circuit considered a similar circumstance in *Okun v. Montefiore Med. Ctr.*, 793 F.3d 277 (2d Cir. 2015). There, the severance policy provided

---

[5]     In another Southern District of New York case, the issue of a materiality determination's effect on the level of the determiner's discretion arose in a different context. In *Clark v. Bank of N.Y.*, 801 F. Supp. 1182 (S.D.N.Y. 1992), the court considered, for the purpose of determining the standard of review, the degree of discretion where an ERISA plan gave the plan administrator the authority to determine whether a plan participant's duties and responsibilities had been "materially diminished" so as to entitle him to benefits. *Id.* at 1189. If the term "materially" conferred on the administrator the discretion to make the benefits decision, the standard of review would be abuse of discretion. *Id.* Otherwise, the review was to be *de novo*. *Id.* The Court found that the term "material" did not confer enough discretion on the administrator to enable a simple abuse of discretion review. *Id.* at 1189-90. The court applied *de novo* review. *Id.* at 1190.

that all full-time physicians "employed before August 1, 1996 who [were] terminated for other than cause" were entitled to either twelve months' notice or six months' severance pay. *Id.* at 278. Employees with more than fifteen years' service were "entitled to automatic review of the amount of severance pay by the President of the Medical Center." *Id.* The policy stated that it was subject to change, modification, or discontinuation at any time with or without notice. *Id.*

The court found that ERISA applied because the policy required discretion and individualized evaluation, particularly as to whether an employee left voluntarily, or was terminated "for cause" or "for one of the other reasons listed in the Policy." *Id.* at 280. "At least on the facts alleged [t]here, [the court did] not agree that a determination as to whether a termination was 'for cause' require[d] only a 'minimal quantum of discretion' insufficient to raise a policy to the level of an ERISA plan." *Id.* at 280 n.2 (comparing *Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997) (holding that "satisfactory manner" performance and termination not "for cause" eligibility requirements "failed to rise to the level of ongoing particularized discretion required to transform a simple severance agreement into an ERISA employee benefits plan")). Additionally, the President was required to engage in a discretionary review for employees with fifteen or more years of service if requested. *Id.* at 280.

Further, the policy had been in place for approximately 24 years. *See id.* "At the motion to dismiss stage [the court thought] it plausible that such a longstanding policy would give employees the reasonable impression that [the defendant] ha[d] undertaken an 'ongoing commitment' to provide severance benefits." *Id.* Many ERISA-governed plans

contain termination clauses and they do "not necessarily defeat an employee's reasonable perception of an ongoing commitment." *Id.* The obligations there contrasted with those in *Fort Halifax* and *James* wherein there was "only a one-time payment in the event of a contingency that was unlikely to recur on a regular basis." *Id.* In *Okun*, the defendant "ha[d] undertaken to pay severance every time an eligible employee [was] terminated for reasons other than cause—a contingency that reasonably [could] be inferred to occur on a relatively regular basis." *Id.* at 280-81.

Finally, while there was less managerial discretion than that required in *Tischmann* or *Schonholz*, for example, there was some required in the President's review and in the "for cause" determination, "and [t]here that [was] enough." *Id.* at 281.

## C.   Cases Outside the Second Circuit

As made evident by the above case analyses, there is no bright line as to when a "for cause" determination, or a materiality determination for that matter, constitutes the type of discretion contemplated by ERISA. *Okun* does not make a blanket finding as to the matter, but states only that, "on the facts alleged [t]here," the "for cause" determination invoked sufficient discretion so as to qualify as an ERISA plan. *Okun*, 793 F.3d at 280 n.2. Both *Tischmann* and *Schonholz* recognized the applicability of ERISA where termination for "substantially deficient performance" (in *Schonholz*) or cause (in *Tischmann*) disqualified the employee from severance, but both cases required numerous ongoing commitments by the employee that entailed discretionary determinations. In contrast, the Southern District cases *Sheer*, *Nowak*, and *Taverna* found no ERISA

coverage on their facts. In light of this, the Court has conducted a survey of other Circuits' handling of the matter for guidance in making a determination here.

The Ninth Circuit held in *Bogue v. Ampex Corp.*, 976 F.2d 1319 (9th Cir. 1992) that a program providing severance in the case of a takeover, if neither the current owner of the company nor the buyer of the company offered the executive "substantially equivalent" employment and the executive's employment was terminated, was governed by ERISA. *Id.* at 1321, 1324. "Substantially equivalent" was defined to include "responsibilities similar" to those from before a takeover. *Id.* at 1321. The company's owner would decide if benefits were appropriate in each case. *Id.* In *Bogue*, the court adopted the approach described by the Fifth Circuit in *Fontenot v. NL Industries, Inc.*, 953 F.2d 960 (5th Cir. 1992).[6] *Id.* at 1323. The administrator in *Bogue* "remained obligated to decide whether a[n] . . . employee's job was 'substantially equivalent' to his pre-acquisition job." *Id.* Despite being triggered by a single event, that event would occur more than once at a different time for each employee, which did not lend itself to the "one-time nondiscretionary application of the plan administrators in *Fort Halifax.*" *Id.* "Although its application was uncertain, its term was short, and the number of

---

[6]     Fleshing out *Pane v. RCA Corp.*, 868 F.2d 631 (3d Cir. 1989), *Fontenot v. NL Industries, Inc.*, 953 F.2d 960 (5th Cir. 1992) asked whether a plan requires an administrative scheme because the "circumstances of each employee's termination [have to be] analyzed in light of [certain] criteria." *Fontenot*, 953 F.2d at 963. In *Fontenot* the employees were to receive benefits upon termination regardless of the reason for termination. *Id.* Concluding that "*Pane* does not stand for the proposition that every 'golden parachute' is an ERISA plan," the court determined in *Fontenot* that ERISA did not govern the plan at issue there. *Id.*

participants was small, the program's administration required a case-by-case discretionary application of its terms." *Id.*[7]

The First Circuit followed *Bogue* in *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849 (1st Cir. 1993), addressing a Massachusetts anti-takeover statute under which employees who had worked at least three years and whose employment was terminated within two years of a change of control were entitled to a one-time lump sum payment of twice their weekly compensation for each year of employment. *Id.* at 851. The employees had to be eligible under the standards of state unemployment. *Id.* While the circumstances were similar to those in *Fort Halifax*, the court determined that they must be "set against several differences," which increased the administrative burden. *Id.* at 853. *Fort Halifax* entailed a single, once-and-for-all event plant closing. *Id.* In *Simas*, each three-year employee's termination would trigger the statute. *Id.* Terminations could occur in several alternate periods and required cross-reference to other eligibility requirements, "most importantly that the employee not have been discharged for cause." *Id.* at 853.

The *Simas* court considered the following distinctions in *Bogue* applicable and persuasive and used them to find that ERISA governed the statute: 1) that the time period

---

[7]     *Cf. Velarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1317 (9th Cir. 1997) (distinguishing its holding from that in *Bogue*, noting, "the key to our holding in *Bogue* was that there was '*enough* ongoing, particularized, administrative discretionary analysis,' . . . not that the agreement simply required some modicum of discretion" and finding that a "single arithmetical calculation to determine the amount of the severance benefits," in conjunction with a "for cause" determination, required only a "slight" level of discretion, failing "to rise to the level of ongoing particularized discretion required to transform a simple severance agreement into an ERISA employee benefits plan" (emphasis in original)).

was prolonged; 2) that individualized decisions were required; and 3) that at least one of the criteria was far from mechanical. *See id.* at 854.

The Seventh Circuit also addressed the issue in *Collins v. Ralston Purina Co.*, 147 F.3d 592 (7th Cir. 1998). That court found a retention agreement to pay six months' salary and a year of COBRA benefits if an employee was terminated by an acquirer, including "any substantial reduction of duties or responsibilities," or any failure on the acquirer's part to "continue to offer existing or substantially similar employee benefits," or a "transfer outside the metropolitan South Bend, IN area," was governed by ERISA. *Id.* at 594-97. The agreement was set to expire fourteen months later. *Id.* at 604. The court stated:

> Even the triggering event prompting a payout . . . presupposes careful claims processing, in other words, an ongoing administrative scheme. The agreement required . . . [the plaintiff's] . . . responsibilities [to be] 'substantially reduced,' which sets a standard, but hardly an easily discernable one. . . . Only an ongoing administrative scheme would allow the company to develop a working definition of 'substantial reduction of duties or responsibilities,' such that it could be consistently applied either to a single employee on multiple occasions or multiple employees on multiple occasions.

*Id.* at 596.

However, the Fourth Circuit has come down on the opposite side as those circuits above in a situation much the same as the case at bar. In *Lomas v. Red Storm Entertainment, Inc.*, 49 F. App'x 396 (4th Cir. 2002), the court found ERISA did not govern a severance plan implicated by a takeover defining "good reason" as including the "termination of [an] Employee's employment by Employee within three months prior to or eighteen months following a Change of Control on account of . . . a material

diminution in status," "a reduction in Base Salary," or a transfer of location necessitating change in principal residence. *Id.* at *3 n.4, 4. In making the finding, the court reasoned:

> A straightforward application of the *Fort Halifax* . . . standard[] to the Agreement . . . indicates that it is not inherently governed by ERISA. . . . The term "good reason" is defined in the Agreement . . . thus leaving [the defendant] with no discretion to determine either (a) whether [the plaintiff] was entitled to severance benefits, or (b) the amount of benefits he was to receive.

*Id.* at *4.

### D.   Analysis

The Court must evaluate the Plan at issue here with due consideration of the foregoing precedent, and in recognition of the fact that Defendants bear the burden of establishing that federal jurisdiction is proper and all factual ambiguities must be construed in favor of Plaintiff. *See Montefiore Med. Ctr.*, 642 F.3d at 327; *Tyco Int'l*, 422 F. Supp. 2d at 391. Applying these factors and precedents here, the Court concludes that Defendants have not met their burden of establishing that ERISA governs the Plan. As a result, this Court lacks subject matter jurisdiction and Plaintiff's motion to remand must be granted.

### 1.   Whether the Employer's Undertaking or Obligation Requires Managerial Discretion in its Administration

Here, no discretion is required under the Plan as to the amount of severance, the timing of the payouts, or the form of the severance. *See Nowak*, 2009 U.S. Dist. LEXIS 69097, at *5; *Sheer*, 2007 U.S. Dist. LEXIS 16488, at *7. Indeed, though requiring potentially complicated math necessitating the involvement of an accountant, nothing more than arithmetic is required to determine the amount of severance a Participant

would receive, as laid out by the formula in § 3 of the Plan. *See James* 992 F.2d at 467;

*Nowak*, 2009 U.S. Dist. LEXIS 69097, at *5; *Sheer*, 2007 U.S. Dist. LEXIS 16488, at *7;

*Taverna*, 2003 U.S. Dist. LEXIS 1607, at *8.

A closer question is raised by whether analysis of the reasons for termination of employment invokes the necessary managerial discretion to trigger ERISA coverage. This inquiry necessarily overlaps with the third factor discussed below (whether the employer is required to analyze the circumstances of each employee's termination separately in light of certain criteria). The cases that have considered this issue—both in this Circuit and outside this Circuit—signify the fine line that is often drawn when considering the issue of whether a "for cause" or materiality determination such as the ones called for under the Plan require the discretion contemplated by ERISA.

Here, while requiring a determination as to whether the employee's termination was "without Cause" or "for Good Reason," the Plan does not leave it there, but rather, goes on to set forth specific criteria for a determination of "without Cause" or "for Good Reason." (Dkt. 1-2 at 14, 16). Plaintiff contends that he terminated his employment because of a "material reduction" in his job responsibilities as defined under the Plan, as well as a "material reduction" in his "incentive compensation opportunity." (Dkt. 1-2 at ¶¶ 29-38). Some level of discretion arguably factors into the question of whether Plaintiff's job responsibilities were materially reduced. However, the other bases for "Good Reason" do not invoke the same degree of discretion. Whether Plaintiff suffered a material reduction in his opportunity for incentive compensation appears to require a mostly mathematic inquiry. In addition, while not at issue here, one of the grounds for

"Good Reason" is a required relocation of more than 30 miles, which plainly would not invoke any type of discretionary determination on the part of the employer.  Finally, if the successor company refused to perform under the terms of the Plan, the "Good Reason" clause would be activated, and no discretionary determination would be required by the employer.

Thus, of the four "Good Reason" factors, the only one that arguably focuses on a discretionary determination is the inquiry as to whether the employee's job responsibilities have been materially reduced.  Yet, unlike *Tischmann* and *Schonholz*, there is no ongoing commitment here required of the employee that invokes some discretionary determination by the employer.

On balance, in view of the relevant case law discussed above, comparing this situation to the facts where the requisite discretion has been found, and as necessary, taking into account that Defendants bear the burden to establish this Court's jurisdiction, this Court determines that the first factor weighs in favor of a finding that the Plan is not governed by ERISA.

### 2.   Whether a Reasonable Employee Would Perceive an Ongoing Commitment by the Employer to Provide Employee Benefits

No reasonable employee would perceive an ongoing commitment by Defendants to provide employee benefits under the structure of the Plan.  First, there are no ongoing responsibilities between Defendants and an employee after termination other than making the severance payments themselves.  *See Sheer*, 2007 U.S. Dist. LEXIS 16488, at *7 ("There are no ongoing responsibilities on the part of the Bank or the employees pursuant

to either agreement once the employee receives her severance payment and leaves the company."). The situation is unlike that in *Tischmann*, where employees receiving severance benefits had to "continue to be available to render the company reasonable assistance, consistent with the level of the Executive's prior position with the Company, at times and locations that are mutually acceptable" and were subject to specific standards of conduct, the violation of which could result in losing severance. 145 F.3d at 566-67. It is also unlike *Schonholz*, where employees receiving severance were required to make reasonable, good faith efforts to obtain suitable employment commensurate with their former organization level and scope of responsibility. 87 F.3d at 76.

Second, the termination date contained in the Plan cuts against a reasonable employee perceiving an ongoing commitment. *Cf. Schonholz*, 87 F.3d at 76-77 ("The Severance Plan's effective period was unlimited and would have reasonably been perceived by an employee as an ongoing commitment."); *Tischmann*, 145 F.3d at 566 (acknowledging that a termination date cuts against this second factor before distinguishing specific facts (not present here) in favor of an ongoing commitment). *Okun* explains that it is plausible for employees to perceive an ongoing commitment based on the existence of a longstanding policy and explains that a termination clause does "not necessarily defeat an employee's reasonable perception of an ongoing commitment," where the obligations contrast with those in *Fort Halifax* and *James*, *i.e.*, one-time payments made in the event of contingencies that are unlikely to reoccur

regularly. 793 F.3d at 280-81. Here, though the Plan is longstanding,[8] it is not generally applicable to all terminations. Rather, it only comes into play if there is a qualifying "Change of Control," and then, for only two years. This situation is distinguishable from that in *Okun*, where the defendant "ha[d] undertaken to pay severance every time an eligible employee [was] terminated for reasons other than cause—a contingency that reasonably [could] be inferred to occur on a relatively regular basis." *Id.* at 280-81.

The Court will also address here Defendants' argument regarding § 4 of the Plan: Effect of Termination on Equity Grants. Defendants assert that "[t]here are special provisions related to the effect of a termination on equity grants, which make it clear that a participant may be paid in other than one lump sum payment when stocks, grants and all other equity-based awards are taken into account." (Dkt. 8 at 17). First, equity grants are discussed under the Plan not as additional severance, but as a mechanism to accelerate vesting and payment for existing benefits. Second, even if they were severance, they are to be paid out no "later than three (3) months after the Participant's Termination Date" (Dkt. 1-2 at 18), and the lack of a lump sum payment would not change the "basic situation." *See James*, 992 F.2d at 466 ("The employee's option to receive the money in bi-weekly installments instead of in a lump sum did not change the basic situation.").

As a result, consideration of this second factor weighs in favor of a finding that the Plan is not governed by ERISA.

---

[8]      The Plan, in one form or another, has been in place since 1999. (Dkt. 1-2 at 13).

3. **Whether the Employer was Required to Analyze the Circumstances of Each Employee's Termination Separately in Light of Certain Criteria**

Putting aside that technically, under § 3 of the Plan, it appears that an accountant should have made the "without Cause" or "Good Reason" determination,[9] this factor raises the closest question in the Court's view.   For the reasons discussed above, however, there are many aspects of the "for Good Reason" determination that require minimal separate analysis by the employer.

Moreover, even if this factor weighed in favor of a finding of ERISA governance, it is simply not sufficient to overcome consideration of the other factors, which tip in favor of finding that the Plan is not governed by ERISA. *See Tischmann*, 145 F.3d at 566 ("We did 'not decide . . . which one or more of these factors will be determinative in every case' because we concluded that all favored the conclusion that a plan had been created.   Nor did we preclude the possibility that other factors might be relevant in a different factual setting." (citations omitted)).

4. **Other "Usual Earmarks" of an ERISA Plan**

The Court's conclusion that consideration of the above three factors weighs in favor of a finding that the Plan is not governed by ERISA is only further buttressed by the fact that very few of the "usual earmarks" of an ERISA plan are present here.   While the Plan itself is a plan document and defines the group of Participants, the Plan provides for no plan administrators, fiduciaries, administrative review, employee contributions,

---

[9] "All determinations required to be made under this Section shall be made by a nationally recognized accounting firm. . . ." (Dkt. 1-2 at 17 (§ 3)).

procedure to submit claims, or monies set aside or held in trust. *See Sheer*, 2007 U.S. Dist. LEXIS 16488, at *10-11; *Taverna*, 2003 U.S. Dist. LEXIS 1607, at *10, 12. Additionally, though mentioning ERISA does not automatically turn a plan into an ERISA plan, there is no mention of intent to be covered by ERISA, and no mention of federal law. Instead, the Plan states that it is governed by Maryland law. (Dkt. 1-2 at 19 (§ 9)). As here, the *Sheer* Court took into account that "[t]he choice of law provision strictly calls for the application of New York law, without reference to ERISA or any federal law." *Sheer*, 2007 U.S. Dist. LEXIS 16488, at *11.

In sum, consideration of the three factors set forth by the Second Circuit ultimately weighs in favor of a finding that the Plan is not governed by ERISA, which is only further supported by the fact that the Plan lacks the usual earmarks of an ERISA plan. As a result, this Court determines that the Plan is not covered by ERISA and the case must be remanded to state court because this Court lacks subject matter jurisdiction over this dispute.

IV.    **The Plan is Not a Pension Plan**

Finally, the Court will briefly address Defendants' contention that, alternatively, the Plan is an employee pension plan because it defers the income of employees beyond the termination of their employment. (Dkt. 8 at 22-23). The Plan does no such thing.

Under 29 U.S.C. § 1002, a pension plan, either by its express terms or as a result of surrounding circumstances, "(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond." 29 U.S.C. § 1002(2)(A)(i)-(ii). The regulations clarify

that a plan should not be deemed an employee pension plan solely because of the existence of severance benefits provided that, *inter alia*, "such payments are not contingent, directly or indirectly, upon the employee's retiring."  29 C.F.R. § 2510.3-2(b)(1)(i).   The Plan does not contemplate retirement at all, much less mention it explicitly.[10]

The case Defendants cite for support is a case in which the plans at issue are patently titled "Deferred Compensation Plan" and "Early Retirement Package," and, therefore, are not remotely reflective of the circumstances presented here.   *See Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 104, 105 (2d Cir. 2008).

Accordingly, the Plan is not an employee pension plan subject to ERISA.

## **CONCLUSION**

In light of the foregoing, this Court does not have subject matter jurisdiction over this matter and Plaintiff's motion to remand (Dkt. 4) is granted.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:        November 10, 2016
              Rochester, New York

---

[10]     The only reference in the Plan to deferred income is in § 3 and is in relation to an entirely separate plan. (Dkt. 1-2 at 17).